COMMONWEALTH vs. JOSE MATTIAS, JR.

Plymouth. October 18, 1979. — December 12, 1979.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Identification. Evidence,* Admissions and confessions, Relevancy and materiality. *Waiver. Error,* Harmless error.

Pretrial identifications of a defendant arising out of a field confrontation raised no due process issue. [788-789]

At a criminal trial, each of three witnesses had an adequate basis for his in-court identification of the defendant. [789-790]

Evidence at a criminal trial warranted a finding that the defendant understood English well enough to make a knowing and intelligent waiver of his Miranda rights. [790-791]

At the trial of a defendant on various charges, including two robberies while armed with a knife, there was no error in the admission of a knife to which the defendant had led police but which, by the Commonwealth's admission, was not the knife used in the robberies, where the defense displayed the knife to the jury in the first instance and where it was marginally probative of the fact that the defendant robbed the victims at knifepoint. [791-792]

There was no merit to a criminal defendant's contention that the judge erred in admitting answers to certain questions put to a police detective. [792-793]

INDICTMENTS found and returned in the Superior Court on January 26, January 27, and March 23, 1977.

The cases were tried before *Cullen,* J., a District Court judge sitting under statutory authority.

*William M. Leonard* for the defendant.

*Rosemary Ford,* Assistant District Attorney, for the Commonwealth.

KASS, J. The defendant was convicted of two instances of armed robbery, assault with intent to rob while armed, armed assault in a dwelling house, and

unlawful possession of a hypodermic syringe (the last conviction was placed on file). On appeal, he asserts five categories of error in the trial.

We summarize the facts which the jury could have found from the evidence furnished by the Commonwealth. At 1:00 A.M. on August 18, 1976, John Conroy, a resident in a rooming house at 46 Spring Street, Brockton, answered a knock on his door. When he opened the door, a man placed a hammer between the door and the door jamb, forced his way into Conroy's room, and demanded money. Conroy said, "I don't have no money." Thereupon the intruder took a steak knife from a table in Conroy's room, put the knife to Conroy's stomach and again demanded money, but obtained no productive response. The intruder then searched the room, including Conroy's mattress, and turned up a walkie-talkie set and a jar containing about $4.00 in pennies. These the intruder took, as well as the knife, leaving the hammer behind. During the intrusion, which lasted eight to ten minutes, the lights were on and Conroy had a full view of his assailant.

Again about 1:00 A.M. of the same night, someone knocked on the door of John Burke, another resident of the same rooming house, forced his way in, put a knife to Burke's stomach, demanded money, descried $3.50, and made off with it. Burke estimated that the intruder was in his apartment for about three minutes.

Later the same night, William Leadbetter, another resident at 46 Spring Street, answered a knock on his door and he, too, found himself with a knife at his belly and confronted with a demand for money. Leadbetter responded, "There is fourteen cents on the table; take it." Whether from compassion or certain minimum standards, the man at the door did not enter but turned and ran down the stairs.

The victims called the police, to whom they described the assailant as a black male about twenty years old with a short afro haircut and wearing a dark red shirt,

dungarees, and white sneakers. Two days later, in the early evening, Conroy, while going home from work, saw a man he recognized as the intruder seated on a yellow bicycle. Conroy at once telephoned Detective Wright of the Brockton police, who had begun an investigation of the rooming house affair. Wright responded by picking up Conroy and Burke and the three of them set out in Wright's car to look for the suspect. Conroy first spotted the man on the yellow bicycle, whom Wright placed under arrest. Conroy confirmed his identification and Burke also positively identified the defendant as his assailant. We shall add other facts appearing from the record in the context of our discussion of the points of law raised by the defendant.

1. *The out-of-court identifications.* Before the jury were empanelled, the trial judge conducted extensive hearings on several defense motions to suppress evidence, including the pretrial identifications by the three victims, Conroy, Burke and Leadbetter. The judge denied the motions without making any findings of fact. Once again, we emphasize that the absence of findings by the trial judge handicaps the process of review and invites a remand for findings on the issues raised by the motions. *Commonwealth* v. *Gordon,* 6 Mass. App. Ct. 230, 240 (1978). *Commonwealth* v. *Cincotta,* 6 Mass. App. Ct. 812, 816 n.1, further appellate review granted, 377 Mass. 920 (1979). In the instant case, fortunately, the available grounds for suppression of pretrial identification of the defendant are sufficiently well defined so that we are able to infer from the record what the trial judge must have found and can test the correctness of his actions on the motions.

Since Conroy first recognized the defendant on a public street, called the police, and then spotted him again, no suggestiveness of any kind attended Conroy's identification. Identification arising out of field confrontation raises no due process issue, and the judge correctly declined to suppress Conroy's identification of the de-

fendant. *Commonwealth* v. *Bumpus,* 354 Mass. 494, 501 (1968), cert. denied, 393 U.S. 1034 (1969). See *Commonwealth* v. *Jones,* 375 Mass. 349, 354-355 (1978), and *Commonwealth* v. *Cincotta,* 6 Mass. App. Ct. at 817 (1979).

Burke's identification of the defendant followed Conroy's shouted recognition. The defendant argues that Burke's identification carried with it, to that degree, an element of suggestiveness. The encounter, however, was accidental and spontaneous and was, therefore, unlike a calculated confrontation in the police station. See *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 262-263 (1970); *Commonwealth* v. *Barnett,* 371 Mass. 87, 93 (1976), cert. denied, 429 U.S. 1049 (1977). See also *Commonwealth* v. *Wheeler,* 3 Mass. App. Ct. 387, 390-392 (1975). It was, again, a field confrontation of the kind described in the *Bumpus* case.

Leadbetter's pretrial identification was made from a group of seven or eight photographs. That is a sufficient array. See *Commonwealth* v. *Finn,* 362 Mass. 206, 208-209 (1972). It is not a defect in the photo identification procedure that the Commonwealth did not produce at trial every photo used in the pretrial array. *Commonwealth* v. *Brown,* 376 Mass. 156, 161-162 (1978). Nor is there merit to the defendant's contention that a lineup should have been used. That a lineup was possible does not require automatic exclusion of other identification procedures. *Commonwealth* v. *Storey,* 378 Mass. 312, 317 (1979).

2. *The in-court identifications.* All three of the holdup victims made an in-court identification of the defendant. Since we have determined that no suggestiveness of any kind surrounded any of the three identifications, "no taint attached to the subsequent in-court identification[s]." *Commonwealth* v. *Venios,* 378 Mass. 24, 29 (1979). Moreover, since the lights were turned on by the victims when they responded to the defendant's knock on their respective doors, each was able to view the defendant and had that independent and adequate basis

for identification from which he could testify at trial. *Commonwealth* v. *Botelho,* 369 Mass. 860, 868 (1976).

3. *Failure to suppress certain pretrial statements and resulting evidence.* The defendant does not deny that the police advised him of his Miranda rights, but contends that his knowledge of English and his educational level were so meager that he could not knowingly and intelligently waive his right to remain silent. Detective Wright gave the Miranda warning orally in English at the time of arrest and again in the police station. The police also called to the attention of the defendant a Miranda warning written in Spanish, which was posted at the police station.

After he gave the defendant the second Miranda warning, Wright asked him if he was involved in any of the robberies which took place in 46 Spring Street (the rooming house) two nights earlier. In substance, the defendant replied that he didn't rob anybody in the building; he only robbed somebody outside the building. Wright then asked the defendant if he would show him the knife used in the particular robbery. The response was that the knife was at the defendant's house. The defendant then led Wright and another police officer, Matta, to a house on Main Street, where the defendant pulled a knife from "a dishwasher type thing." That knife, which by the Commonwealth's admission was not the knife used in the assaults upon Conroy, Burke and Leadbetter, was admitted in evidence.

Again, our review of this issue is complicated by the failure of the judge to state the facts which led him to determine that the defendant knowingly waived his Miranda rights. Since, however, only one issue has been raised by the defendant, i.e., his capacity to comprehend the warning and, therefore, waive his rights in an understanding fashion, we are on safe ground in concluding that the judge found that the defendant knew enough English to understand what he was doing. Basis for this exists in the record. Police testimony established that

the defendant appeared to understand English and answered in English. Conroy, Burke and Leadbetter testified that the defendant spoke English; and Conroy and Burke, of course, were present at the defendant's apprehension when the business of the arrest was transacted in English. Cross-examination of the defendant at the suppression hearing also brought out that this was not his first arrest. Prior experience with arrest procedures may be considered in assessing whether the defendant made a knowing and intelligent waiver of his Miranda rights. *Commonwealth* v. *Howard,* 4 Mass. App. Ct. 476, 480 (1976). On a review of the entire record and applying the principles set forth in *Commonwealth* v. *Hosey*, 368 Mass. 571, 576 (1975), and *Commonwealth* v. *Jackson,* 377 Mass. 319, 325 (1979), we conclude that the judge could properly resolve the issue of credibility about the defendant's comprehension in favor of the Commonwealth.

4. *Introduction in evidence of the knife not used in the crime.* Our resolution of the Miranda issue disposes of the defendant's contention that the knife introduced in evidence should have been suppressed because it was obtained in violation of the defendant's privilege against self-incrimination. Still unresolved, however, is the contention that the knife had no relevance to the crime committed and that its admission was highly prejudicial to the defendant. The knife to which the defendant led the police first surfaced at the trial through a tactic of the defense: during cross-examination of Conroy, defense counsel displayed the knife in question and asked him if it was his. Conroy said that it was not; that his knife was smaller. Later in the trial, the Commonwealth, over the objection of the defense, offered the larger knife as an exhibit. The trial judge admitted the knife in evidence "for whatever probative value it may serve." The knife was not wholly unlike that which the victims described and was marginally probative of the fact that the defendant robbed the victims at knifepoint. It is the

contention of the defendant that the knife had the capacity to inflame the jury. In balancing probative value against dangers, courts afford considerable leeway to the discretion of the trial judge. *Commonwealth* v. *Bys,* 370 Mass. 350, 360-361 (1976), citing *Davis* v. *Boston Elev. Ry.,* 235 Mass. 482, 502 (1920). McCormick, Evidence 440-441 (2d ed. 1972). Since the jury were advised of the circumstances in which the knife was found, we do not perceive any mischief likely to result from its admission, especially since the defense displayed the knife to the jury in the first instance. *Commonwealth* v. *Williams, ante* 283, 290 (1979). *Commonwealth* v. *Andrade, ante* 653, 657 (1979). See *Commonwealth* v. *Gouveia,* 371 Mass. 566, 570 (1976).

5. *Claims of error in the admission of answers to questions to Detective Wright.* In order to attack the credibility of Conroy's identification, defense counsel asked Conroy if he knew whether the defendant was Puerto Rican or black. Conroy said he could not tell on visual examination alone. The Commonwealth later put fundamentally the same question to Wright, i.e., whether he could tell whether a person was black or Puerto Rican just by looking at him; Wright said that he could not. In context, we find nothing prejudicial in the question or the answer.

Finally, the defense objects to the Commonwealth's question to Wright on redirect examination inquiring where he received information that the intruder was bearded. Wright gave the name of one Flanders, another resident of 46 Spring Street, who had not appeared as a witness. Evidence as to what Flanders said was properly excluded. The identification of Flanders as the source of information that the intruder was bearded came in without objection. Follow-up questions as to where Flanders lived were objected to; Wright was allowed to answer. In view of the unequivocal identifications of the defendant as the intruder (especially those made by Conroy, who recognized his assailant independent of

police initiation), even had error occurred, it would have been harmless beyond a reasonable doubt. *Commonwealth* v. *Andujar,* 7 Mass. App. Ct. 777, 780 (1979).

*Judgments affirmed.*