COMMONWEALTH *vs.* ANTHONY R. SILVA
(and a companion case[1]).

Essex.   December 10, 1985. — January 30, 1986.

Present: GREANEY, C.J., PERRETTA, & FINE, JJ.

*Due Process of Law,* Vagueness of statute. *Constitutional Law,* Cruel and unusual punishment. *Controlled Substances. Statute,* Construction. *Practice, Criminal,* Motion to suppress. *Entrapment.*

Language in G. L. c. 94C, § 32E (*b*), stating three categories of activity that constitute trafficking in cocaine, contained no ambiguity which would render the statute unconstitutionally vague. [539-541]

The mandatory sentencing provisions of G. L. c. 94C, §§ 32E (*b*) (3) and 32H, providing a ten-year minimum prison sentence for a defendant convicted of trafficking in two hundred grams or more of cocaine, do not prescribe "cruel or unusual" punishment in violation of art. 26 of the Massachusetts Declaration of Rights, either on their face or as applied to defendants who had no record of previous drug violations. [541-545]

A judge properly denied a criminal defendant's motion to suppress his statement to police, where the evidence at the hearing on the motion would have warranted findings that the defendant, who was mature and under no disability, had volunteered the statement after having received and understood the Miranda warnings, either to curry favor with the police or in response to a suggestion from a police officer, which the defendant admitted he did not understand as a promise. [545-546]

A defendant being tried on charges of trafficking in and distributing cocaine was not entitled to have the jury instructed that it would constitute entrapment if he had been induced to commit the offenses by his codefendant as the result of contact between the codefendant and a government agent, where there was no evidence either that the inducement relied upon by the codefendant in making his own claim of entrapment had been communicated to the defendant, or that the government had engaged the codefendant in order to draw the defendant into a criminal scheme. [547-550]

INDICTMENTS found and returned in the Superior Court Department on January 19, 1983.

---

[1] Against Roberto Saparosi.

Pretrial motions for dismissal and for suppression of evidence were heard by *John J. Irwin, Jr., J.,* and the cases were tried before *Walter E. Steele, J.*

*William A. Bolton* for Anthony R. Silva.

*Eugene Patrick McCann* for Roberto Saparosi.

*Elin H. Graydon,* Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. For trafficking in 200 or more grams of cocaine, the Legislature has fixed a mandatory minimum penalty of ten years in prison. G. L. c. 94C, § 32E(*b*) (3), as appearing in St. 1982, c. 650, § 11. After a joint trial before a jury in the Superior Court, the defendants were convicted of trafficking at that level and of distributing cocaine in violation of G. L. c. 94C, § 32A, as appearing in St. 1982, c. 650, § 7. Silva was sentenced to a term of ten to fifteen years' imprisonment at M.C.I., Cedar Junction, on the trafficking charge and to a concurrent five to ten year term on the distributing charge. Saparosi was sentenced to a ten to twelve year term of imprisonment on the trafficking charge. His conviction of distributing was placed on file with his consent.

On appeal, both defendants argue that their motions to dismiss the charges were erroneously denied. The motions sought dismissal on contentions, first, that G. L. c. 94C, § 32E(*b*), which prohibits trafficking in cocaine, is unconstitutionally vague, and, second, that the sentencing provisions of c. 94C, §§ 32E(*b*) (3) and 32H, prescribe "cruel or unusual punishment" in violation of art. 26 of the Massachusetts Declaration of Rights. In addition, Saparosi argues that the motion judge erred in denying his motion to suppress his post-arrest statements to the police and that the trial judge erred in refusing to give his requested instruction on the concept of "indirect entrapment."

The indictments stem from two transactions which occurred on January 13 and 14, 1983, at Silva's place of business, a lounge in Lawrence. The State police had received information that a large amount of cocaine was available for sale at the lounge and subsequently mounted an undercover operation that led to the defendants' arrest. At trial, the defendants did

not dispute whether they had possessed or sold cocaine but claimed instead that they had been entrapped by the actions of an undercover State police trooper, Gregory C. Dern, and a police informant, Barry McCarthy.

There was evidence in the defendants' case that on January 11, 1983, a Greg Freitas and the informant, McCarthy, were in Silva's lounge before 4:00 P.M. and again after 9:30 or 10:00 P.M. When they returned to the lounge, McCarthy beckoned Silva over and said, "I'm looking for one or two grams of cocaine. Do you know anyone that can help?" Silva responded, "No." Within the next hour, according to Freitas, McCarthy, still in the bar area, asked Silva twice more for assistance in obtaining cocaine. Silva appeared to be agitated at the request. Finally, McCarthy and Freitas followed Silva into his office, where McCarthy renewed the request. There, Silva responded that he might know someone who could help. He called in Saparosi and said, "Bob, do me a favor. Get these guys off my back. See if you can help them." Saparosi allegedly stated, "Are you serious? I know how you feel," to which Silva replied, "Yeah, just help them . . . ." McCarthy and Saparosi talked, and Saparosi left to make a telephone call. When Saparosi returned, he said to McCarthy, "I can't help you out," but indicated that McCarthy could obtain the two grams he sought the following day. On the next day (January 12) McCarthy told Silva that he would pick up the cocaine the day after (January 13) with a friend.

On January 13, 1983, McCarthy, accompanied by Trooper Dern, went to Silva's bar. Dern asked Silva to sell him some cocaine, and after initial protests Silva again turned to Saparosi, asking, "Bobby, do you think you can get an ounce for them?" Saparosi stated, "I don't know . . . I'll have to ask the guy." Saparosi then spoke to one Carlos Arturo, who was sitting in the bar. Arturo left the lounge, and Saparosi returned to McCarthy and Dern and indicated that Arturo could get an ounce of cocaine for $2,300.[2] While Arturo was gone, Dern asked Silva

---

[2] Arturo and another defendant, one Luz Rodriguez, were arrested with Saparosi and Silva but were tried separately.

about buying a pound of cocaine. Silva again stated that he was not in the business of selling cocaine. However, Silva later requested that Saparosi ask Arturo whether he could also obtain a pound; the answer was affirmative. When Arturo returned, he gave a white object to Saparosi. Saparosi gave an ounce of cocaine to Silva, who sold it to Dern for $2,300. Silva gave the money to Saparosi, who, in turn, gave it to Arturo. Silva also told Dern the price of the pound of cocaine and gave him the lounge office phone number so that Dern could verify his intention to proceed with the larger purchase.

On the afternoon of January 14, Trooper Dern and undercover State Trooper William Gorman went to Silva's office at the lounge to buy the pound of cocaine. Dern gave Silva $32,000 in exchange for two bags which contained slightly less than one pound of cocaine.[3] Silva testified at trial that he had obtained the cocaine from Saparosi, who had previously obtained it from Arturo. As soon as the exchange took place, Trooper Gorman arrested Silva. Trooper Dern then went into the bar and arrested Saparosi.

1. *Constitutionality of the statute — the claim of vagueness.* The defendants argue that their motions to dismiss the indictments should have been allowed because the statute under which they were convicted of trafficking in cocaine is void for vagueness.

General Laws c. 94C, § 32E(*b*), as appearing in St. 1982, c. 650, § 11, provides as follows:[4] "Any person who trafficks in cocaine or any salt thereof by knowingly or intentionally [1] manufacturing, distributing, or dispensing or [2] possessing with intent to manufacture, distribute, or dispense or [3] by bringing into the commonwealth a net weight of twenty-eight grams or more of cocaine or any salt thereof or a net weight of twenty-eight grams or more of any mixture containing

---

[3] The total was 396.5 grams of cocaine. One bag contained 167.8 grams of fifty-three percent cocaine. The second bag contained 228.7 grams of fifty-nine percent cocaine. General Laws c. 94C, § 32E(*b*), prohibits trafficking in "any mixture" of cocaine that exceeds the various amounts specified therein.

[4] The bracketed numbers are inserted for purposes of later discussion.

cocaine or any salt thereof " shall be punished, by an increasing scale of mandatory minimum prison sentences, depending on the total net weight of the cocaine involved.[5] The defendants focus on the Legislature's use of commas in [1] and the "or" before the word "dispensing." They contend that the commas should be read as having the conjunctive force of the word "and", while the "or" should be given its usual disjunctive sense. The defendants concede that the statute may mean that engaging in any one of the various types of conduct specified in § 32(*b*) will constitute trafficking. Undaunted by that conclusion, however, they press their construction to argue that the statute is ambiguous because it may also be read as intending to punish only those defendants whose conduct involves the manufacture of cocaine *and* one other of the specified acts.

Applying recognized standards of construction,[6] we find no ambiguity in subsection (*b*) of G. L. c. 94C, § 32E, much less support for the crabbed interpretation of the statute's language that the defendants propose. In [1], [2], and [3], subsection

---

[5] For twenty-eight grams or more but less than 100 grams, a mandatory minimum sentence of three years' imprisonment; for 100 grams or more but less than 200 grams, a mandatory minimum sentence of five years' imprisonment; for 200 grams or more, a mandatory minimum sentence of ten years' imprisonment. In each case, the maximum sentence of imprisonment is set at fifteen years. Fines (in amounts designated) may also be imposed.

The minimum punishment established by § 32E(*b*) (3) is mandatory in the sense that G. L. c. 94C, § 32H, provides that a sentence under § 32E shall not be suspended or reduced until the mandatory minimum term has been served, nor until that time shall the prisoner be eligible for parole.

[6] In examining the controverted language, we are mindful that due process requires that criminal statutes be sufficiently clear to give notice of the prohibited conduct, see *Commonwealth* v. *Bohmer,* 374 Mass. 368, 371 (1978), and that ordinary rules of statutory construction require that we construe any criminal statute strictly against the government. See *Commonwealth* v. *Gagnon,* 387 Mass. 567, 569 (1982). These principles are guides to resolving ambiguity where it exists. They do not require that we find ambiguity where it does not exist or that we adopt any interpretation that most favors a defendant. "[T]he vagueness doctrine is not a counsel of perfection." *Commonwealth* v. *Gallant,* 373 Mass. 577, 580 (1977). Where the language in a criminal statute conveys a definite warning of the proscribed conduct, when measured by common understanding and practice, it is constitutionally adequate. *Opinions of the Justices,* 378 Mass. 822, 827 (1979).

(b) sets forth three categories of activity that will constitute trafficking in cocaine. The first category lists three types of conduct that, for the purposes of this discussion, we shall term active behavior, namely, manufacturing, distributing, and dispensing. Within subsection (b), these types of behavior are listed (and conventionally punctuated with commas) as items in a series. The serial commas are not, as the defendants contend, a substitute for the word "and" inserted between coordinate adjectives. The words in the enumeration in [1] are gerunds (verbal nouns), not adjectives, and the "obvious sense," see *Gaynor's Case,* 217 Mass. 86, 89 (1914), dictates reading each of the commas as standing in place of an "or." So too, the context of [1] and its manifest purposes indicate that the "or" is to be given its ordinary disjunctive meaning. See *id.* at 90; *Bello* v. *South Shore Hosp.,* 384 Mass. 770, 782 (1981), quoting from *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Authy.,* 350 Mass. 340, 343 (1966). Thus, a showing of any one of the three activities set forth in [1] will support a conviction for trafficking in cocaine. See *Commonwealth* v. *Olivo,* 369 Mass. 62, 66-67 (1975).[7] We conclude that the statute, on its face, sets out with sufficient clarity "ascertainable standards of guilt," and as a result, is not void for vagueness. *Winters* v. *New York,* 333 U.S. 507, 515 (1948). See *Opinions of the Justices,* 378 Mass. 822, 827 (1979).

2. *Constitutionality of the statute — the claim of "cruel or unusual" punishment.* The defendants also argue that their motions to dismiss the indictments should have been allowed because the mandatory minimum ten-year prison sentence, see

---

[7] Moreover, in G. L. c. 94C, § 32E(b), the Legislature specified other forms of conduct that will also constitute trafficking. One set of alternatives, set forth in [2], and also punctuated with serial commas, comprises possession of cocaine with the intent to manufacture, distribute or dispense it. The final activity identified by [3] as trafficking consists of bringing more than twenty-eight grams of cocaine, a cocaine salt, or a mixture of cocaine or a salt of cocaine into the Commonwealth. The use of the disjunctive "or" between each segment of the statute indicates again that a showing of any one of the activities will constitute trafficking.

Commonwealth v. Silva.

note 5, *supra*, for someone who traffics in 200 grams or more of cocaine (a Class B controlled substance), constitutes "cruel or unusual" punishment in violation of art. 26 of the Massachusetts Declaration of Rights.[8] Their argument has two prongs: the first, that the penalty on its face impermissibly conflicts with art. 26, and, the second, that the punishment is constitutionally infirm when applied to offenders who, like the defendants, have no previous record of drug violations.

We consider the first challenge (alleging facial invalidity of the punishment under art. 26) foreclosed by the reasoning in *Opinions of the Justices,* 378 Mass. at 829-833. In those Opinions, the Justices of the Supreme Judicial Court considered the penalty provision of an earlier proposed version of G. L. c. 94C, § 32 (1979 Senate Doc. No. 777 of 1979) which would have imposed a mandatory minimum twenty-five year prison sentence on persons convicted of trafficking in any Class A through D controlled substance having a street value in excess of $25,000. A majority of the Justices concluded, after application of the relevant three-part analysis for determining whether punishment violates the Eighth Amendment to the United States Constitution or art. 26 of the Declaration of Rights,[9] that the proposed twenty-five year sentence for drug trafficking would not conflict with either constitutional provision. In our view, it necessarily follows from the majority's opinion that the ten-

---

[8] Article 26 provides that "[n]o magistrate or court of law, shall . . . inflict cruel or unusual punishments." This provision may have a meaning different from the language used in the Eighth Amendment to the United States Constitution ("nor cruel and unusual punishments inflicted"). See *Cepulonis* v. *Commonwealth,* 384 Mass. 495, 496 n.2 (1981), appeal dismissed, 455 U.S. 931 (1982).

[9] The test examines whether the challenged penalty is so disproportionate to the crime that it "shocks the conscience and offends fundamental notions of human dignity," *Commonwealth* v. *Jackson,* 369 Mass. 904, 910 (1976), quoting from *In re Lynch,* 8 Cal. 3d 410, 424 (1972), by: (1) considering the nature of the offense and the offender, and the penological purposes of the prescribed punishment; (2) comparing the challenged punishment with the penalties imposed for the same or similar crimes in other jurisdictions; and (3) comparing the punishment with penalties for other crimes in the Commonwealth. *Commonwealth* v. *Jackson, supra* at 910-916.

year mandatory minimum sentence prescribed by G. L. c. 94C, §§ 32E(b) (3) and 32H, for someone convicted of trafficking in 200 or more grams of cocaine (in these cases the sale involved slightly less than a pound for $32,000) is not prohibited by art. 26.[10] See also *Commonwealth* v. *Marcus,* 16 Mass. App. Ct. 698 (1983) (finding a mandatory five-year prison sentence for distributing a class A controlled substance when imposed on a repeat offender selling no more heroin than was necessary to support his habit not violative of the prohibitions against cruel or unusual punishment).

We also reject the contention that the punishment violates art. 26 when applied to offenders like the defendants, who have no previous record involving drug offenses.[11] A statute designed to protect the public from illegal drugs recognizes that drug addiction "degrades and impoverishes those whom it enslaves" and that addiction is a significant cause of family disruption and crime. *People* v. *Broadie,* 37 N.Y. 2d 100, 113, cert. denied, 423 U.S. 950 (1975). The most culpable in the "pernicious cycle" of illegal drug use are narcotics traffickers selling for profit, for they provide a critical link in spawning more addicts and sellers. *Carmona* v. *Ward,* 576 F.2d 405, 412 (2d Cir. 1978), cert. denied, 439 U.S. 1091 (1979). We have stated that the "Legislature may . . . reasonably impose severe punishment upon those convicted of [drug] traffic in

---

[10] We note that some other jurisdictions impose comparably severe mandatory minimum prison sentences for large sales of illegal controlled substances. See, e.g., Georgia, fifteen years and $250,000 fine for the sale of 200 to 400 grams (Ga. Code Ann. § 16-13-31 [a] [2] [Supp. 1985]); New York, fifteen years for the sale of two or more ounces of controlled substances, including cocaine (New York Penal Law §§ 220:43, 60:05-2, 70.00-3 [a] [i] [McKinney Supp. 1986]); South Carolina, twenty-five years and $100,000 fine for the sale of 200 to 400 grams (S.C. Code Ann. § 44-53-370 [e] [2] [d] [Law. Co-op. 1976]); Tennessee, ten years, with maximum of life imprisonment and discretionary $200,000 fine, for the sale of thirty grams or more (Tenn. Code Ann. § 39-6-417 [c] [1]-[2] [Supp. 1985]).

[11] A similar challenge to the constitutionality of applying the statute to first offenders was raised but not decided in *Commonwealth* v. *Varney,* 391 Mass. 34, 46 (1984).

the hope of discouraging not only the primary crime . . . but . . . the secondary personal and property crimes" as well. *Commonwealth* v. *Marcus, supra* at 699.

The Legislature could rely on these considerations and could note as well the evils of cocaine[12] in establishing a ten-year mandatory minimum prison sentence for persons in the defendants' circumstances who are convicted of trafficking. Dealing in 200 grams or more of cocaine usually signals the presence of a large-scale dealer who has access to the drug in quantity and who is intent on profit without regard for the law or its consequences. Moreover, because "narcotics sales are not simply isolated economic transactions," *Opinions of the Justices*, 378 Mass. at 831, the sale by the defendants of close to a pound of cocaine would likely lead to untold misery on the streets and more crime.[13]

While we recognize that the efficacy of mandatory minimum sentencing can be reasonably debated, there is substantial support for the theory that definite punishment will help to reduce crime. See *Opinions of the Justices, supra* at 832. See also *Commonwealth* v. *Jackson*, 369 Mass. 904, 912-913 (1976). In imposing a nondiscretionary minimum ten-year prison sentence on any offender under the statute, the Legislature may have sought, by the certainty of the punishment, to remove

---

[12] Cocaine is a particularly addictive and toxic drug. See Uelmen & Haddox, Drug Abuse and the Law Sourcebook § 2.6 (a) (1985). According to estimates by the National Institute on Drug Abuse, every day about 5,000 Americans try cocaine for the first time. Other estimates indicate that about 22,000,000 people have experimented with the drug so far. Addiction is easily achieved and hard to cure. "The number of people with cocaine related problems seeking admission to federally funded drug clinics climbed by 600 percent from 1976 to 1981 — the most recent period for which a figure is available. The surge in admissions to private clinics has undoubtedly been as great." Lieber, Coping with Cocaine, The Atlantic Monthly 39 (Jan. 1986). See also Uelmen & Haddox § 2.6 (c).

[13] Testimony from Trooper Dern indicated that average street quality cocaine is twelve to sixteen percent pure. Reduced to a street quality of fifteen percent, the amount of cocaine involved in this case, see note 3, *supra*, could yield approximately 1,500 grams. In light of Trooper Dern's testimony that street quality cocaine sells for $100 per gram, the quantity sold here could have been worth about $150,000. See also Uelmen & Haddox, Drug Abuse and the Law Sourcebook, *supra* § 2.6 (b).

traffickers from society and to deter others from similar criminal activity. See *Commonwealth* v. *Marcus, supra* at 701. The Legislature may also have reasoned that achieving these goals could, in turn, help curb the rising incidence of cocaine use and that the goals are reasonably related to recognized purposes of punishment. See *Cepulonis* v. *Commonwealth,* 384 Mass. 495, 499 (1981), appeal dismissed, 455 U.S. 931 (1982). In the absence of any constitutional requirement that a mandatory minimum sentence be imposed only on a repeat offender, and in view of the fact that the criminal activity engaged in by the defendants was indicative of large-scale drug dealing, the defendants' sentencing in accordance with the requirements of G. L. c. 94C, §§ 32E(*b*) (3) and 32H, did not amount to "cruel or unusual" punishment under art. 26.

3. *Motion to suppress.* After his arrest, Saparosi was driven to the State police barracks in Andover by Troopers Dern and Gorman. During the ride, and after having been read the Miranda warnings, Saparosi allegedly stated, "I was only doing this to make a few extra dollars. I have a wife and children and I needed the money. I had just met Carlos Arturo several days earlier. He came up from New York and he said he had eight kilos of cocaine." Saparosi's motion to suppress these statements was denied prior to trial. At the hearing on the motion to suppress, Saparosi testified on direct examination by his trial counsel that he had never had any experience with the police before, that the police questioned him both before and after reading the Miranda warnings, and that Trooper Dern had made certain statements Saparosi understood to mean that he would receive favorable treatment if he gave the police information.[14]

The motion judge made no findings of fact in connection with his denial of the motion, as he should have. See *Commonwealth* v. *Mattias,* 8 Mass. App. Ct. 786, 788 (1979). However, we do not think that a remand for findings is necessary,

---

[14] Saparosi testified that Trooper Dern had told him that "if I talked to the sergeant and gave him some kind of information, that he can help me too." Saparosi indicated that he understood this to mean that "whatever charges could be against me, he [Dern's superior] could help me out."

as the grounds on which the motion was heard "are sufficiently well defined so that we are able to infer from the record what the trial judge must have found and can test the correctness of his action[] on the motion[]." *Ibid.* See also *Commonwealth v. Gaulden,* 383 Mass. 543, 547 (1981).

There was evidence that Saparosi was born in Argentina, studied engineering in college there for two years, and had been in the United States for seven years at the time of his arrest. Twenty-nine years old, he was married, had a child, and had been employed in the Lawrence area. Saparosi understood English and was fluent in the Spanish and Italian languages as well. He was given all the Miranda warnings, which he admitted he understood. There was no evidence that, at the time of his arrest, he was incapacitated by either alcohol or drugs. He did not have any mental or physical illness. He further indicated that neither Trooper Dern nor Trooper Gorman had threatened him at any time, and that Trooper Dern was not "aggressive" toward him after he had been given his Miranda warnings. Saparosi further admitted, in cross-examination, that Trooper Dern had promised him "nothing at all." The challenged statement was made after Saparosi received and understood his Miranda warnings. According to Trooper Dern, he had asked Saparosi no questions after giving him the Miranda warnings and prior to the point at which the statement was volunteered by Saparosi.

On the evidence described, we think the motion judge could permissibly have concluded either (a) that Saparosi had volunteered the statement after having received and understood the Miranda warnings, perhaps to curry favor with the police, or (b) that the statement had been made (again after receipt and understanding of Miranda warnings) in response to a general suggestion by Trooper Dern that Saparosi's cooperation would be brought to the attention of Dern's superior, a suggestion that Saparosi admitted he did not understand as a promise. On either analysis, the denial of the motion to suppress was proper.[15]

---

[15] With respect to alternative (b), as was stated in *Commonwealth* v. *Meehan,* 377 Mass. 552, 564 (1979):

"An officer may suggest broadly that it would be 'better' for a suspect

4. *Entrapment instructions.* Saparosi made a request of the trial judge that the jury be instructed in accordance with the instruction set forth in the margin,[16] and his counsel made a timely and specific objection to the judge's failure to give the requested instruction. He argues that the lack of the instruction, or something like it, constitutes reversible error.

The instruction was designed to raise in Saparosi's behalf the issue of indirect or vicarious entrapment. That concept has been defined as follows: "If a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly." *United States* v. *Valencia,* 645 F.2d 1158, 1168 (2d Cir. 1980), reh'g en banc denied, 669 F.2d 37 (2d Cir. 1981), aff'd after remand, 677 F.2d 191 (2d Cir. 1982). Although there is room for dispute as to the circumstances in which the government can be held responsible for entrapment by a third person,[17] there is no question that "[e]ntrapment . . .

---

to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past. What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence." (Footnotes with citations to decisions omitted.)

[16] "You may find that Mr. Silva was entrapped or you may find that Mr. Silva was not entrapped; you may find that, as a result of the contact between Mr. McCarthy, the government informant, and Mr. Silva that Mr. Silva did induce Mr. Saparosi, and if you do find Mr. Saparosi was induced by Mr. Silva then you may find that Mr. Saparosi has a defense of entrapment as a result of those actions."

[17] The disagreement over the nature of conduct sufficient to give rise to a claim of indirect entrapment is illustrated by Judge Van Graafeiland's dissent in the original *Valencia* decision, 645 F.2d at 1172-1176, and by his further dissent from the denial of rehearing of that decision en banc, 645 F.2d 1176, 1177-1179. See also, Note, Entrapment Through Unsuspecting Middlemen, 95 Harv. L. Rev. 1122 (1982).

may occur as the result of conduct by [third parties who in effect are acting as government] agents or as a result of governmental action through private citizens. See, e.g., *Lopez* v. *United States,* 373 U.S. 427 (1963); *United States* v. *Russell,* 411 U.S. 423 (1973); *United States* v. *Myers,* 692 F.2d 823 (2d Cir. 1982), cert. denied, 461 U.S. 961 (1983); *United States* v. *Silvestri,* 719 F.2d 577 (2d Cir. 1983); *United States* v. *Thompson,* 366 F.2d 167 (6th Cir. 1966); *Johnson* v. *United States,* 317 F.2d 127 (D.C. Cir. 1963)." *United States* v. *McLernon,* 746 F.2d 1098, 1109 (6th Cir. 1984). As a general proposition, in a case involving contact between a middleman and a defendant, the issue of entrapment will not arise in the absence of some evidence showing that the government's inducement of the middleman has been communicated to the defendant or evidence showing that the middleman was consciously recruited by the government to induce the defendant to join in the commission of the crime. See *United States* v. *Toner,* 728 F.2d 115, 126-127 (2d Cir. 1984). As was said in *United States* v. *Myers, supra* at 840 n.13: "Government responsibility [on the basis of entrapment] has been rejected where the circumstances showed [that ] . . . [a government] agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, *takes it upon himself* to induce another person to participate in the crime" (emphasis supplied). See also Note, Entrapment Through Unsuspecting Middlemen, 95 Harv. L. Rev. 1122, 1129 (1982).

We think that Saparosi's evidence was insufficient to raise an issue as to his entrapment (on the basis of Silva's alleged entrapment) because the evidence did not show a sufficient nexus between the government's activity with Silva and Saparosi's conduct. There was no evidence to show that the inducement relied upon by Silva to claim entrapment had been communicated to Saparosi.[18] Nor was there any evidence which

---

[18] We do not consider Silva's request of Saparosi on January 11 — "Bob, do me a favor. Get these guys off my back. See if you can help them." — as communicating the government's inducement of Silva to Saparosi in a manner which would create an issue as to indirect entrapment. We note that in *United States* v. *McLernon, supra* at 1108, the middleman, a Mexican Indian, had a "blood brother" relationship with the government agent. The defendants alleged that they were acting in response to the agent's preying

would warrant a finding by the jury that the government had engaged Silva in order to draw Saparosi into a criminal scheme. Because the State police had information that Silva was selling cocaine, the "sting" operation to purchase drugs did not of necessity have to involve Saparosi (or, for that matter, any other defendant). Moreover, Saparosi's basic position at trial was that he was a somewhat unsuspecting dupe who acted out of friendship and loyalty to Silva. Thus, the situation depicted by the evidence indicated that the criminal opportunity created for Saparosi, vis à vis Silva, stemmed not from activity by government agents but from Silva's independent management of the details of the enterprise.[19]

In this context, the trial judge gave Saparosi the benefit of a comprehensive and clear charge on the possible role of the government in the crimes. The jury were told that they should acquit Saparosi if they should find that "the actions of the law enforcement officers or their agents were so fundamentally unfair as to be offensive to . . . basic standards of decency, justice and fairness . . . ."[20] The jury were also told to consider whether Saparosi had been entrapped.[21] In that regard, there were ample and correct instructions on the elements of entrapment, including an instruction that "persons who are not law

upon the "love and loyalty" of the agent's blood brother relationship with the middleman. However, the court in *McLernon* refused to find sufficient evidence of indirect entrapment where there was neither third-party agency use of the middleman to entrap the defendants nor a special relationship like marriage (or blood brotherhood) between the defendants and the middleman. 746 F.2d at 1109. The defendant in the case before us makes a considerably less compelling argument for our applying the defense to his case.

[19] Alternatively, the evidence could be found to show that the trilingual Saparosi was a willing and useful conduit in a scheme to assist Carlos Arturo, a Hispanic who purportedly spoke no English, in marketing eight or more kilos of cocaine in cooperation with Silva.

[20] This instruction, in essence, advised the jury that they should acquit Saparosi if they concluded that the government's conduct was so shocking or offensive that it deprived him of his constitutional right to due process of law.

[21] This instruction was apparently based on the evidence pertaining to Saparosi's contact with McCarthy, who was a government agent.

enforcement officials, [but who] act with official encourage-
ment or insistence [are to be] consider[ed] [g]overnment agents
for the purpose of . . . entrapment." The jury were also told,
at several points in the final charge, that they could acquit
Saparosi on the basis of entrapment without finding that Silva
had been entrapped. This instruction, taken with the broad
definition given to the term "government agent," may have
directed the jury to the possibility that Saparosi's contact with
Silva, as opposed to his contact with McCarthy, could justify
a finding of entrapment. In that respect, the charge may have
been more favorable to Saparosi than was warranted. Based
on the evidence, we conclude that Saparosi received the benefit
of all that he was entitled to. The rejection of his proposed
instruction on entrapment was not error.

*Judgments affirmed.*