# DECISIONS

## OF THE

## APPEALS COURT

### OF

## MASSACHUSETTS

---

COMMONWEALTH *vs.* JOHN F. COYNE
(and two companion cases[1]).

No. 95-P-1013.

Suffolk. October 18, 1996. - November 20, 1997.

Present: ARMSTRONG, DREBEN, & JACOBS, JJ.

*Entrapment. Practice, Criminal,* Instructions to jury, Argument by prosecutor. *Controlled Substances.*

No substantial risk of a miscarriage of justice arose in a criminal case from the judge's giving, on his own motion, an instruction to the effect that a defendant's addiction to cocaine should be taken into account in weighing the likelihood that the defendant was, as he claimed, entrapped into trafficking in cocaine in an amount exceeding 100 grams. [4]

Where at the trial of indictments for trafficking in cocaine, the jury rejected one defendant's assertion of entrapment as a defense, error, if any, in the judge's refusal to instruct the jury on a codefendant's claim of "derivative" entrapment was harmless. [4-5]

At the trial of indictments for trafficking in cocaine, there was no risk of a

---

[1]Commonwealth *vs.* Michael T. Coyne and Commonwealth *vs.* Douglas Hall.

miscarriage of justice arising from the judge's failure to instruct on his own motion that a police informer was a government agent as a matter of law, where that fact was not in dispute. [5]

In a criminal case, the judge's instructions on the Commonwealth's burden of proof with respect to the defense of entrapment were sufficient and no risk of a miscarriage of justice was demonstrated. [5]

In the circumstances of the trial of an indictment for trafficking in a class B controlled substance, no substantial risk of a miscarriage of justice arose from the incidental admission of one prior conviction of the defendant of simple possession of another class B controlled substance along with two prior convictions of the defendant of distribution of a controlled substance, as evidence of the defendant's predisposition to distribute. [5-6]

At a criminal trial, a single excessive remark by the prosecutor in closing argument, to which no objection was made, did not warrant reversal of the defendants' convictions. [6-7]

In a criminal case, the prosecutor's characterization of the defendants in closing argument as "trying to run and hide" did not constitute reversible error, where it did not, in the circumstances, amount to a reference to some defendants' failure to testify. [7-8]

INDICTMENTS found and returned in the Superior Court Department on October 19, 1993.

The cases were tried before *Robert A. Mulligan*, J.

*Alexander M. Esteves* for Michael Coyne.

*Regina Zupan*, Committee for Public Counsel Services, for Douglas Hall.

*William J. Meade*, Assistant Attorney General, for the Commonwealth.

*Peter M. Dempsey*, for John F. Coyne, submitted a brief.

ARMSTRONG, J. The three defendants were convicted of trafficking in cocaine in an amount exceeding 100 grams, G. L. c. 94C, § 32E(*b*)(3). The three were caught red-handed (indeed, videotaped) in the act of making the sale to undercover State police officer Michael Grassia. They had been put in touch with Grassia by one Lloyd Goldman, himself a seller of cocaine, who had been convicted but promised a lenient sentence for cooperating with the Commonwealth by introducing police officers to dealers who dealt in large quantities.

The contact was initiated by a call from Goldman to Grassia. Upon reaching Grassia, Goldman passed the telephone to the defendant Michael Coyne (Michael), who negotiated with Grassia and agreed to supply him with four and one-half ounces of cocaine for a price of $4,000. The deal was consummated later

that day, the defendant John Coyne (John) talking with Grassia several times to finalize the time and location. John and Grassia met at a Burger King restaurant at the appointed time, 10:00 P.M.; Michael and the defendant Douglas Hall (Hall) were watching, with the cocaine, from a car parked nearby. Grassia persuaded John to execute the transaction at his, Grassia's, purported apartment, which was in fact owned and used for this purpose by the Attorney General's narcotics and organized crime division. Grassia said that, for reasons of safety, he did not want more than two of the defendants to come up to the apartment, and, after some discussion, it was agreed that John would wait in the car while Michael and Hall would go up to the apartment to receive the $4,000 and witness the weighing and sampling of the cocaine. Hall stuffed the bag with the cocaine into his pants and went upstairs with Michael and Grassia. While going through the mechanics of settlement, Michael and Grassia tentatively worked out an eight ounce transaction for the following week. Hall admired Grassia's scale, which handled up to 250 grams. Hall wanted to get one that large. Hall and Michael were counting the bills when the trap was sprung. All this was videotaped. Other officers arrested John in the car below.

Faced with the practical impossibility of denying the fact of the attempted sale, two of the defendants, the two Coynes, relied on the defense of entrapment. John testified that he had been the victim of Goldman's wiles, that he had been unwilling to sell drugs and had refused Goldman's enticements repeatedly, but that Goldman, knowing that John was addicted to cocaine, promised to "take care of him, big time," meaning, according to John, that he would furnish John with cocaine to feed his habit if John would arrange for a sale to Goldman's friend Grassia.[2] Michael's argument was that he was "derivatively entrapped" — a concept that "has been defined as follows: 'If a person is brought into a criminal scheme after being informed indirectly of conduct or statements by a government agent which could amount to inducement, then that person should be able to avail himself of the defense of entrapment just as may the person who receives the inducement directly.' "
*Commonwealth* v. *Silva*, 21 Mass. App. Ct. 536, 547 (1986),

---

[2]Goldman was called as a witness by Michael, in an effort to establish a foundation for his defense of derivative entrapment. Goldman's testimony, recounting uninduced, unhesitant involvement, preceded that of John.

quoting from *United States* v. *Valencia,* 645 F.2d 1158, 1168 (2d Cir. 1980), reh'g en banc denied, 669 F.2d 37 (2d Cir. 1981), aff'd after remand, 677 F.2d 191 (2d Cir. 1982).

1. John's principal argument on appeal is that the judge erred in not giving an instruction in his jury charge to the effect that a defendant's addiction to narcotic drugs should be taken into account in weighing the likelihood that he was, as he claims, entrapped. His counsel did not seek such an instruction, however, or object to the charge as given. Thus, assuming for purposes of decision that such an instruction should have been given in the circumstances (but see *Commonwealth* v. *Quirk,* 27 Mass. App. Ct. 258, 263 [1989]), we look to the possibility that a substantial risk of a miscarriage of justice may have resulted from its omission. This seems very unlikely. The judge did instruct the jury that "[i]nducement by a law enforcement agent may take many forms, including . . . promises of rewards . . . ," adequately conveying, in succinct form, the message for which the defendant contends. The matter of John's particular susceptibility to the reward assertedly promised could hardly have been lost on the jury. John's testimony about repeated pleas by Goldman, coupled with occasional gifts of small amounts of cocaine, in an effort to break down John's and Michael's resistance, found no support in the testimony of Goldman, who denied making gifts of cocaine.[3] John's entrapment contention was further weakened by evidence that he had been twice before convicted of distribution of PCP (phencyclidine), also (like cocaine) a class B controlled substance. See G. L. c. 94C, § 31, Class B(*a*)(4) & (*e*)(4). "It is not unlawful for the government to set out bait for someone who takes the lure with alacrity." *Commonwealth* v. *Colon,* 33 Mass. App. Ct. 304, 306 (1992). Altogether, it was not a promising case for an entrapment defense.

2. Michael's principal contention on appeal is that the judge should have instructed the jury on the subject of derivative entrapment, on the theory that Goldman's inducements to John were responsible for his (Michael's) participation in the sale.

---

[3]John's counsel did report to the judge that "[w]hereas I found no objection, my client finds an objection to your entrapment [instructions] . . . . My client said he found it prejudicial." It was later clarified that John wanted the judge to read "the Mass. General Laws definition of entrapment." The judge pointed out that there was no such definition, and the objection was not pursued further.

This defense also seems like a poor fit to the case, because there was no evidence of rewards to or harassment of Michael, and, as was said in the *Silva* decision, *supra* at 548, the entrapment defense does not apply where a government "agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime." It may well be, moreover, that even if a derivative entrapment defense could theoretically apply in this situation, the jury's rejection of John's claim of entrapment made any error as to Michael's derivative claim harmless. Compare *Commonwealth* v. *Silva*, 21 Mass. App. Ct. at 550.[4]

3. Michael also contends that the judge should have instructed that Goldman was a government agent as a matter of law, based on *United States* v. *Annese*, 631 F.2d 1041, 1048 (1st Cir. 1980), which held that where the government agent status was not in dispute, it was error for the judge to put the issue to the jury as a fact to be decided by them. The *Annese* decision was clarified in *United States* v. *Alzate*, 70 F.3d 199, 200 (1st Cir. 1995), where the court stated that "*Annese* certainly does not hold that it is reversible error to forego the instruction now claimed necessary where, as here, no such instruction is sought and there is no indication of prejudice." In this case, no such instruction was sought, and there was certainly no substantial risk of a miscarriage of justice deriving from its absence.

4. As to Michael's final contention: the judge, in our view, *did* sufficiently instruct on the Commonwealth's burden to prove beyond a reasonable doubt the defendants' predisposition to engage in the transaction. "Bear in mind that the Commonwealth must prove beyond a reasonable doubt that the defendant was not entrapped before you may find him guilty of the crime charged." No objection was made to the charge on this basis. No substantial risk of a miscarriage of justice was created.

5. Based on *Commonwealth* v. *Vargas*, 417 Mass. 792, 796

---

[4]Indirectly, Michael probably benefitted from the judge's refusal to instruct on derivative entrapment. After the defendants rested, the prosecutor asked the judge to rule on whether he would give the derivative entrapment instruction sought by Michael. If the judge were to do so, the prosecutor wished to introduce as rebuttal evidence Michael's prior convictions for distribution of narcotics, said to be numerous. The judge ruled that he would instruct generally on entrapment (i.e, not limited to John) but would not instruct on derivative entrapment. The prosecutor did not offer the prior convictions.

(1994), which was decided three weeks after the trial, John argues that he should receive the benefit of the rule announced therein that "the crime of possession [of a narcotic], by itself, is not similar to the crime of distribution for purposes of proving a predisposition to distribute." The Commonwealth introduced as evidence of John's predisposition two prior convictions of distribution and one prior conviction of simple possession of PCP, which, as mentioned earlier, is, like cocaine, a class B controlled substance. The prior convictions of distribution of PCP are to be treated as similar to the crime of distribution of cocaine for purposes of the *Vargas* rule. The incidental admission of the prior conviction of simple possession of PCP did not create a substantial risk of a miscarriage of justice. There was, moreover, no objection to the judge's charge to the jury on the subject of considering prior convictions of similar crimes as evidence of predisposition.[5]

6. The prosecutor in closing argument included a paragraph, the second of the successive paragraphs set out in the margin,[6] that the defendants read as having urged the jury to convict the defendants in order to play their part in the war on drugs, as in, most notably, *Commonwealth* v. *Ward*, 28 Mass. App. Ct. 292, 292-294 (1990). See *Commonwealth* v. *Burke*, 373 Mass. 569, 576 n.3 (1977); *Commonwealth* v. *Smith*, 387 Mass. 900, 910-911 (1983). The prosecutor was on dangerous ground, but we think his remarks, in context of the whole closing argument, fell short of urging the jury to convict the defendants to combat drug trafficking. The prosecutor was fully within the evidence in arguing that the defendants were sophisticated drug dealers, and arguing that the jury should "make them pay the piper" was only a colloquial variant of urging them to convict, which

---

[5]In closing argument the prosecutor mistakenly referred to the prior distribution conviction as involving cocaine. The judge forcefully instructed the jury that this was erroneous, that the evidence had concerned PCP. John's trial counsel expressed his satisfaction with the correction.

[6]"It is crystal clear. There's no rocket science or brain surgery involved in this case. This was a sophisticated drug operation. They were driven by plain and simple greed. They are — actually, they were drug dealers, experienced drug dealers. The time has now come for them to pay the piper. They were caught. They have to pay the piper. Only you, ladies and gentlemen, can hold them to it and make sure that they do.

"Traffickers need to know that this system is going to work, and they will pay. You can do this by returning a verdict of guilty against all three defendants."

would be proper. Generalizing the thought out to "[t]raffickers need to know . . . they will pay" was improper because it suggested that the jury's decision concerned traffickers in general rather than these defendants in particular. But the excessive remark was fleeting, compare *Commonwealth* v. *Westerman*, 414 Mass. 688, 700-701 (1993), rather than a persistent theme, as in *Commonwealth* v. *Ward*, *supra* at 294, and no objection was made to the remark. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 & n.8 (1987).

7. The prosecutor, in his closing, made an argument, set out in the margin,[7] that characterized the defendants as now, i.e., at trial, "trying to run and hide." The defendant Hall argues that this characterization must be interpreted, and was probably understood by the jury, as a comment on the defendants' failure to testify. Hall cites *United States* v. *Hardy*, 37 F.3d 753 (1st Cir. 1994), in which the same words — "running and hiding" (at 757) — *were* so interpreted, and the conviction overturned for that reason. Four points differentiate this case from *Hardy*. In *Hardy*, a case that did not involve a claim of entrapment, neither of the two defendants testified, and the only possible connotation of the running and hiding phrase was "that the defendants were running from the evidence presented against them, and hiding behind their right to silence during the trial." *Id.* at 758. Here, two of the defendants were claiming entrapment, and the run and hide language can be understood in context to relate to their "hiding behind [an entrapment defense]." Second, in this case, unlike in *Hardy*, one of the defendants — John — *did* testify, so the language accusing the defendants collectively of trying to run and hide would not readily be understood to refer to their not testifying. Third, in *Hardy*, the defense counsel objected promptly and moved for a mistrial. Here, in contrast, no objection was taken on this basis, "perhaps a true gauge of the importance counsel attached to [the alleged impropriety] at the time." *Commonwealth* v. *Therrien*, 371 Mass. 203, 208 (1976). A fourth difference lies in the fact that the evidence implicating the defendants in *Hardy* was regarded as not particularly strong. 37 F.3d at 759. The evidence

---

[7]"Each and every one of the [defendants] told Trooper Grassia, and Trooper Grassia told you under oath, about the history of their dealings, how long they have been doing this, that they have been trafficking for a long time. They plotted and they planned, and they thought they had a big fish, and that fish turned out to be Trooper Grassia, and now they are trying to run and hide."

implicating the defendants in this case, by contrast, was essentially conclusive, the only issue being presented by the entrapment defense which, as we have observed, had distinct weaknesses, not the least of which was the defendants' ability to produce major trafficking quantities of cocaine on short notice.

Although the *Hardy* decision does not control in the circumstances of this case, prosecutors would do well to take note of the hazard involved in the use of the words, "run and hide," to characterize a defendant's trial strategy in a case where he or she does not testify. The word "hide" is uniquely susceptible of being understood as a reference to the defendants' silence, and, when so understood, of being a basis for reversal. See, e.g., *Commonwealth* v. *Domanski*, 332 Mass. 66, 69-71 (1954); *Commonwealth* v. *Hawley*, 380 Mass. 70, 82-84, 88-89 (1980); *Commonwealth* v. *Smith*, 387 Mass. 900, 908-909 (1983); Smith, Criminal Practice & Procedure § 1859 (2d ed. 1983). A skillful and disciplined prosecutor will resist the temptation to use rhetorical clichés that threaten mistrials or reversals on appeal.[8]

*Judgments affirmed.*

---

[8]Appellate counsel was not the trial prosecutor.